UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

AMERICAN COMMERCIAL LINES   )
LLC,   )
   )
                Plaintiff,   )
   )
          vs.   )      No. 4:12-cv-00135-SEB-WGH
   )
THE  LUBRIZOL CORPORATION,   )
VCS CHEMICAL CORP.,   )
MARK  MICHELSEN,   )
   )
              Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
LUBRIZOL'S MOTION TO DISMISS**
[Docket No. 110]

This cause is before the Court on Defendant Lubrizol Corporation's ("Lubrizol")

Motion to Dismiss the Second Amended Complaint [Docket No. 110], filed on July 19,

2013, pursuant to Federal Rule of Civil Procedure 12(b)(6).  This litigation arose

following Plaintiff American Commercial Lines LLC's ("ACL") purchase of a diesel fuel

product called "Ultra Max" from Defendant VCS Chemical Corporation ("VCS").  In this

action, ACL alleges that VCS defrauded ACL by misrepresenting that the Ultra Max

contained an additive that was supplied to VCS by Lubrizol.  ACL does not allege that

Lubrizol itself made any misrepresentation to ACL about the Ultra Max fuel product,

claiming instead that Lubrizol's actions and omissions created apparent authority on the

part of VCS and Defendant Mark Michelsen to act on behalf of and thus bind Lubrizol in

dealings with ACL. Pursuant to this theory, ACL has brought various claims against Lubrizol, including fraud, constructive fraud, civil deception, breach of contract, and tortious interference with contract. For the reasons detailed in this entry, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendant Lubrizol's Motion to Dismiss those claims.

**<u>Factual Background</u>**

ACL is a marine transportation and manufacturing company operating on the United States Inland Waterways System, which consists of the Mississippi River System, the Ohio River System, their connecting waterways, and the Gulf Intracoastal Waterways. ACL currently operates a fleet of over 2,000 barges and 125 tow boats (collectively referred to as "towing vessels"). Sec. Am. Compl. ¶ 11. Lubrizol is a specialty chemical company that is in the business of, *inter alia*, inventing, formulating, testing, and manufacturing diesel fuel additives that improve fuel economy, reduce emissions, and reduce wear on diesel engines. Among other products, Lubrizol developed and exclusively manufactured the diesel fuel additive LZ8411A (the "Lubrizol Additive"). *Id.* ¶¶ 18-19.

Many of Lubrizol's products, including the Lubrizol Additive, are not sold by Lubrizol directly to end users. Instead, Lubrizol works thorough channel partners who market and distribute the products to the ultimate consumers. *Id.* ¶ 20. ACL alleges that VCS was Lubrizol's channel partner and authorized agent for marketing and selling the Lubrizol additive. According to ACL, Lubrizol represented to third parties, including ACL, that VCS was its exclusive agent for the marketing and sale of the Lubrizol Additive. Lubrizol provided VCS with marketing materials promoting Lubrizol and its

products so that VCS could distribute those materials to potential customers, including ACL. With input from Lubrizol, VCS also prepared correspondence to potential customers promoting Lubrizol's products. VCS sold and marketed the Lubrizol Additive to end users under the trade name "Ultra" or "Ultra Max." *Id.* ¶¶ 21-25.

In 2008, VCS contacted ACL to market the use of the Lubrizol Additive for use in ACL's towing vessels, representing that use of the Lubrizol Additive would increase engine efficiency and performance while reducing fuel consumption. ACL was not then a customer of Lubrizol's, but was familiar with the company and interested in Lubrizol products. *Id.* ¶¶ 26-27. On October 29, 2008, representatives from ACL, Lubrizol, and VCS met at ACL's headquarters in Jeffersonville, Indiana, and VCS and Lubrizol delivered a technical presentation on the Lubrizol Additive. At that meeting, VCS and Lubrizol emphasized that the Lubrizol Additive was manufactured by Lubrizol and, according to ACL, represented that VCS was Lubrizol's exclusive agent for the sale of the Lubrizol Additive to ACL and also implied that VCS was the exclusive supplier of the product by representing that VCS Ultra Max was the only fuel additive product that contained the Lubrizol Additive. *Id.* ¶¶ 28-29.

Following the October 29th presentation, ACL agreed to participate in a field test ("the Field Test") of the Lubrizol Additive using ACL's towing vessels to determine whether the product would reduce ACL's fuel consumption and emissions. Lubrizol insisted that it be given ownership rights to all statistical evidence gathered during the Field Test so it could use the information for various purposes, including marketing the Lubrizol Additive to other companies. *Id.* ¶ 31. For a number of months, VCS, Lubrizol

and ACL worked together to develop the protocol for the Field Test and ACL alleges that, during this period, VCS presented itself to ACL on numerous occasions as working for and speaking on behalf of Lubrizol. According to ACL, at no point during their interactions did Lubrizol take any affirmative action to separate itself from VCS or otherwise indicate that VCS did not have authority to speak on Lubrizol's behalf. *Id.* ¶ 36.

On September 14, 2009, ACL entered into a Memorandum of Understanding with VCS concerning the Fuel Trial which provided that ACL agreed to allow the testing of the Lubrizol Additive (and no other product) in certain of its towing vessels and that ACL would enter into a 'definitive purchase agreement for the exclusive utilization" of the Lubrizol Additive if the Field Tests satisfactorily demonstrated its effectiveness in reducing fuel consumption. *Id.* ¶ 39. Although Lubrizol was not a signatory to the agreement, Lubrizol's in-house counsel as well as other Lubrizol employees participated in the negotiation and drafting of the Memorandum of Understanding and Lubrizol gave consent to the final version of the agreement. *Id.* ¶¶ 40-41.

During the Field Test, the Lubrizol Additive was used on eight of ACL's towing vessels. Lubrizol supplied and installed the dosing equipment that was used to inject the Lubrizol Additive into the fuel of ACL's vessels. Over the course of the Field Test, fifteen metric tons of the Lubrizol Additive was used. Shipments of the Lubrizol Additive sometimes came directly from Lubrizol to ACL and at other times were shipped from VCS. *Id.* ¶¶ 51-52. Lubrizol made its representatives available to provide support to ACL as needed throughout the Field Test and representatives from Lubrizol, ACL, and

VCS communicated frequently and met on several occasions to discuss the progress of the Field Test. According to ACL, throughout the Field Test, VCS presented itself as working for and speaking on behalf of Lubrizol when scheduling meetings among the three companies; by providing documents bearing Lubrizol's name and mark; and by making guarantees on Lubrizol's behalf regarding fuel efficiency improvement. ACL alleges that Lubrizol was aware that VCS was acting in its name and permitted VCS to do so by making no effort to separate itself from VCS or otherwise indicate to ACL that VCS did not have authority to speak and act on Lubrizol's behalf. *Id.* ¶¶ 53-59.

On October 27, 2010, Lubrizol and VCS presented ACL with their analysis of the results of the Field Test. At that presentation, Lubrizol stated that use of the Lubrizol Additive had resulted in a significant reduction of fuel consumption in ACL's vessels. Specifically, Lubrizol represented that, based on the results of the Field Test, ACL would save approximately 2.6% or $2,654,500 on its annual diesel fuel costs by using the Lubrizol Additive in its towing vessels. *Id.* ¶ 63. Approximately one month later, on November 23, 2010, Lubrizol memorialized its final analysis of the results of the Field Test in a report ("the Final Report"). In the Final Report, Lubrizol again stated that adopting the Lubrizol Additive system-wide would result in fuel efficiency savings of 2.6% or 2,080,000 gallons of diesel fuel.[1] *Id.* ¶ 64.

Following the conclusion of the Field Test and the issuance of the Final Report, VCS entered into discussions with ACL regarding a long-term supply contract. ACL

---

[1] ACL hired the University of Louisville to independently validate these results. Upon its own review, the University of Louisville determined that the statistical methodology used by Lubrizol during the Field Test was technically sound. Sec. Am. Compl. ¶ 70.

alleges that, throughout these discussions, VCS consistently referenced Lubrizol and implied that Lubrizol would also continue to be involved in the supply relationship. According to ACL, VCS also consistently referred to the product that would be supplied to ACL as a Lubrizol product. *Id.* ¶¶ 66-67. ACL ultimately decided to purchase the Lubrizol Additive for use in approximately 70 of its towing vessels, and, from February 7, 2011 to November 8, 2011, it ordered and purchased $1,062,862.75 worth of a product it believed to be the Lubrizol Additive. *Id.* ¶ 68. ACL alleges that its decision to purchase the Lubrizol Additive was driven in part by the results of the Field Test and also by representations by both VCS and Lubrizol that Lubrizol would continue to be involved in the supply relationship. *Id.* ¶¶ 70, 72.

On February 7, 2011, ACL placed its first order with VCS for 72 drums of the Lubrizol Additive. A few days earlier, on February 2, 2011, VCS had placed an order with Lubrizol for the Lubrizol Additive in contemplation of filling ACL's initial order. According to ACL, Lubrizol was aware that VCS was placing the order so that it could fill ACL's order. On February 3, 2011, Lubrizol approved the order from VCS. *Id.* ¶¶ 79-82. A few weeks later, on February 23, 2011, Lubrizol issued to VCS an "Order Acknowledgement" confirming the order of the Lubrizol Additive and listing ACL as the "ship-to" recipient. *Id.* ¶¶ 85-86.

Lubrizol subsequently prepared barrels of the Lubrizol Additive to fill VCS's order, but those barrels were never delivered to VCS or ACL. *Id.* ¶¶ 87, 89. Instead, on March 4, 2011, Lubrizol informed VCS that it would not provide VCS with the Lubrizol Additive and that it would, in fact, no longer continue to do any business with VCS. *Id.*

¶¶ 90-91.  This decision was based on the results of an internal ethics investigation into the relationship between one of Lubrizol's employees and VCS, which revealed that the employee had failed to disclose that, while employed at Lubrizol, he was also a principal and agent of VCS.  *Id.* ¶ 92.  Neither Lubrizol nor VCS informed ACL of these developments.  *Id.* ¶ 93.

Although VCS was no longer able to procure the Lubrizol Additive, VCS nonetheless purported to fill ACL's purchase orders for the product.  From April 2011 to November 2011, VCS delivered to ACL $1,062,862.75 worth of a fuel additive labeled "Ultra Max" which VCS represented was the Lubrizol Additive but which was actually a counterfeit additive that did not contain LZ8411A or any other Lubrizol product.  *Id.* ¶¶ 94-96.  Neither VCS nor Lubrizol ever informed ACL that it was not receiving the Lubrizol Additive, and ACL was not otherwise on notice that it was being supplied with the counterfeit additive or that the business relationship between Lubrizol and VCS had been terminated.  *Id.* ¶¶ 101, 109.

Despite indications as early as the spring and summer of 2011 that VCS was supplying ACL with a product that was not the Lubrizol Additive and having informed other joint customers that its relationship with VCS had ended, Lubrizol did not provide this information to ACL until November 8, 2011.  *Id.* ¶¶ 113-14.  According to ACL, up until that point in time, it believed that it was purchasing and using the Lubrizol Additive, that Lubrizol was continuing to monitor the fuel consumption of ACL's towing vessels to verify that the continued use of the Lubrizol Additive was beneficial to ACL, and that VCS was acting as Lubrizol's agent for the sale of the Lubrizol Additive.  *Id.* ¶¶ 115-17.

Once ACL discovered that it had not been supplied the Lubrizol Additive, it ceased using the counterfeit additive in its towing vessels. *Id.* ¶ 147.

ACL filed the instant litigation on November 5, 2012, and has subsequently amended its complaint twice, filing its Second Amended Complaint on June 20, 2013, which governs this dispute. On July 19, 2013, Lubrizol filed the instant motion to dismiss. That motion is now fully briefed and ready for decision.

## Legal Analysis

### I. Standard of Review

Lubrizol has filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Under Rule 12(b)(6), the Court must accept as true all well-pled factual allegations in the complaint and draw all ensuing inferences in favor of the non-movant. *Lake v. Neal*, 585 F.3d 1059, 1060 (7th Cir. 2009). Nevertheless, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and its "[f]actual allegations must . . . raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (citations omitted). The complaint must therefore include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 8(a)(2). Stated otherwise, a facially plausible complaint is one which permits "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When, as here, a plaintiff alleges claims sounding in fraud, it must satisfy Federal Rule of Civil Procedure 9(b), which requires that "a party must state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The reason for this heightened pleading standard is to prevent plaintiffs from charging a defendant with fraud irresponsibly. *See Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). A plaintiff "claiming fraud … must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate.' … A complaint alleging fraud must provide 'the who, what, when, where, and how.'" *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999)). Still, absolute particularity is not required, and in considering the motion to dismiss, the court still construes all inferences in the light most favorable to the non-movant. *See Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003).

## II.     Discussion

### A.     Counts II, IV, VI, and XII: Claims Based on Apparent Authority

Lubrizol first seeks to dismiss all claims that are asserted against it on the basis of its alleged agency relationship with VCS, to wit, Counts II (fraud), IV (civil deception), VI (breach of contract), and XII (quasi-contract). ACL rejoins that these allegations have been properly pled and would support liability on the part of Lubrizol under a theory of apparent authority.

Under Indiana law, apparent authority "is the authority that a third person reasonably believes an agent to possess because of some manifestation from the agent's principal." *Cain Fam. Farm, L.P. v. Schrader Real Estate & Auction Co., Inc.*, 991 N.E.2d 971, 977 (Ind. Ct. App. 2013) (citation omitted). Apparent authority does not

arise based on the actions or statements of the agent. *Id.* Instead, "[i]t is essential that there be some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party" that an agency relationship exists. *Id.* The required manifestations "need not be in the form of direct communications, but rather the placing of the agent in a position to perform acts or make representations which appear reasonable to a third person is a sufficient manifestation to endow the agent with apparent authority." *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 677 (Ind. 2001) (internal quotation marks and citation omitted). Whether an agency relationship exists is generally a question of fact for the jury. *Robertson v. Ticor Title Ins. Co.*, 982 N.E.2d 9, 21 (Ind. Ct. App. 2012) (citing *Douglas v. Monroe*, 743 N.E.2d 1181, 1187 (Ind. Ct. App. 2001)).

Lubrizol argues that the only allegations in the Second Amended Complaint regarding statements or actions taken in the presence of ACL that could be considered manifestations of apparent authority were made by VCS, the purported agent, and not by Lubrizol, the purported principal. Thus, even if true, an agency relationship cannot be established based on apparent authority. ACL rejoins that its allegations that Lubrizol failed to express dissent in the face of VCS's manifestations are sufficient to satisfy its pleading burden.

In a case such as this one, where an alleged agency relationship gives rise to claims against the principal that require heightened pleading, such as ACL's fraud claim, the Rule 9(b) pleading standard applies to allegations of agency only if "the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship…." *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 783 (7th Cir.

1999).  However, where, as here, the plaintiff does not rely on the substantive allegations of fraud to establish the agency relationship, allegations of agency may be pled generally, according to the liberal pleading standard under Rule 8.  *See Brugos v. Nannenga*, No. 2:03-CV-547, 2005 WL 3730317, at *2 (N.D. Ind. Dec. 5, 2005).

Our careful review of the allegations contained in the Second Amended Complaint and the accompanying exhibits persuades us that ACL has failed to meet even the liberal Rule 8 pleading standard for alleging apparent authority.  The only affirmative representation that Lubrizol made, according to ACL's allegations, was in the context of Lubrizol's and VCS's joint marketing pitch to ACL in October 2008.  ACL alleges that, during that meeting, Lubrizol and VCS represented to ACL that VCS was Lubrizol's exclusive agent for the marketing and sale of the Lubrizol Additive.  Even if true, the mere fact that VCS may have been represented as the exclusive supplier or seller of the Lubrizol Additive is not the same as a representation that VCS functioned as Lubrizol's agent with the authority to speak for Lubrizol or otherwise bind it.  ACL also alleges that Lubrizol provided VCS with marketing materials promoting Lubrizol's products so that VCS could distribute those materials to potential customers, including ACL.  However, there is nothing unusual nevermind potentially fraudulent in a supplier like Lubrizol providing such marketing materials to help resell its products.  We see no reasonable basis, therefore, on which to infer or otherwise conclude that these actions constitute manifestations of agency.

Nor are we persuaded by ACL's argument that Lubrizol can be held liable under an agency theory for its failure to correct the perception created by VCS's statements and

actions that VCS was authorized to speak and act on Lubrizol's behalf. The Second Amended Complaint sets forth sweeping allegations regarding *VCS*'s alleged manifestations of agency, to wit, that VCS presented itself as working and speaking on behalf of Lubrizol throughout the Field Test; provided to ACL documents bearing Lubrizol's name and mark; made commitments on Lubrizol's behalf; and consistently referenced and implied Lubrizol's joint involvement in the supply relationship. However, the exhibits attached to the Second Amended Complaint in support of these allegations disclose that Lubrizol was, in fact, not copied on many of the email communications in which ACL alleges VCS created such manifestations. Thus, Lubrizol lacked an opportunity to contradict or correct any overstepping on the part of VCS. *See, e.g.*, Exh. 14; Exh. 22; Exh. 29; Exh. 30. Moreover, the emails on which Lubrizol was copied show only that VCS coordinated communications among all three companies and organized schedules for meetings, etc. *See* Exhs. 12-13; 23-25. They do not evidence that VCS was speaking on behalf of Lubrizol, as ACL alleges.

In short, ACL's allegations clearly establish that for some initial time period at least, a commercial relationship between VCS and Lubrizol existed in which VCS resold (perhaps even exclusively) the Lubrizol Additive for Lubrizol. However, to create apparent authority sufficient to cloak all the dealings between the parties, much more must be shown than simply the existence of a commercial relationship. For the reasons and in the ways detailed above, ACL has failed to meet that burden here.

  **B.**  **Count III: Constructive Fraud Claim**

In Count III of the Second Amended Complaint, ACL alleges that Lubrizol is liable for constructive fraud based on Lubrizol's failure to disclose to ACL that it had cut ties with VCS and ended their commercial relationship. "Constructive fraud arises by operation of law from a course of conduct, which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." *In re Rueth Development Co.*, 976 N.E.2d 42, 52 (Ind. Ct. App. 2012) (citing *In re Bender*, 844 N.E.2d 170, 182 (Ind. Ct. App. 2006)). Under Indiana law, the elements of constructive fraud are: "(1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party." *Am. Heritage Banco, Inc. v. Cranston*, 928 N.E.2d 239, 246 (Ind. Ct. App. 2010) (citing *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996)).

Under Indiana law, a special duty between parties for constructive fraud "may arise in one of two ways: by virtue of the existence of a fiduciary relationship, or, in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Am. Heritage Banco*, 670 N.E.2d at 247 (citing *Rice*, 670 N.E.2d at 1284 (Ind. 1996)). In a constructive fraud action like this one that is based on alleged misrepresentations between a buyer and a seller as opposed to a fiduciary relationship, "no presumption of

fraud arises and the burden is on the plaintiff to prove all five elements of constructive fraud." *Id.* (citing *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. Ct. App. 2002)).

"In determining whether a non-fiduciary relationship between parties will sustain a claim for constructive fraud, the 'focus is on whether the relationship invokes a duty of good faith and fair dealing.'" *Frey v. Workhorse Custom Chassis LLC*, 1:03-CV-01896, 2005 WL 775927, at *11 (S.D. Ind. Mar. 25, 2005) (quoting *Mullen v. Cogdell*, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994)). "In certain relationships, one party may be in the unique possession of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other; such a relationship is one that invokes a duty of good faith and fair dealing." *Mullen*, 643 N.E.2d at 401. In other words, "the party alleging constructive fraud must 'be in a position of inequality, dependence, weakness, or lack of knowledge.'" *Frey*, 2005 WL 775927, at *11 (quoting *Nicoll v. Community State Bank*, 529 N.E.2d 386, 389 (Ind. Ct. App. 1988)).

Generally, whether a legal duty exists between parties is a question of law. *See Purcell v. Old Nat'l Bank*, 972 N.E.2d 835, 842-43 (Ind. 2012). However, "factual questions regarding the circumstances surrounding the relationship between parties may 'render[ ] the existence of a duty a mixed question of law and fact to be determined by the [trier of fact].'" *Frey*, 2005 WL 775927, at *11 (quoting *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 48 (Ind. Ct. App. 2004)).

Here, ACL alleges in its constructive fraud claim that Lubrizol owed it a special duty by virtue of Lubrizol's: (1) role as a "seller of a highly technical product"; (2) possession of "proprietary knowledge concerning the statistical model it created and

employed for monitoring the performance of the Lubrizol Additive"; and (3) possession of "superior knowledge concerning its relationship with, and the role played by, VCS." Sec. Am. Compl. ¶¶ 166-67. Lubrizol rejoins that, even assuming these allegations are true, as we are required to do at this stage of the litigation, none of these circumstances is sufficient to have created a special duty on Lubrizol's part to disclose the fact that its commercial relationship with VCS had ended. Lubrizol further argues that ACL's constructive fraud claim cannot survive summary judgment because, even if Lubrizol had a duty to ACL to disclose the termination of its relationship with VCS, ACL cannot establish the fifth element of a constructive fraud claim, to wit, that Lubrizol gained an advantage by failing to inform ACL that its commercial relationship with VCS had ended.

Here, the allegations in the Second Amended Complaint fail to give rise to a finding that a special duty existed between ACL and Lubrizol sufficient to support a claim of constructive fraud. Lubrizol's possession of proprietary information regarding the chemistry of the Lubrizol Additive and its statistical model that ACL did not possess is beside the point, in terms of the constructive fraud claim, because there is no allegation that the harm to ACL resulted from any misrepresentation of or failure to disclose this particular information by Lubrizol. For example, ACL does not allege that it relied on Lubrizol to perform any test(s) on the additive it had received to determine whether it was the Lubrizol Additive and Lubrizol either lied about whether it could perform the testing, or, performed the testing and lied about the results. To the contrary, the Second Amended Complaint alleges that ACL requested that Lubrizol perform such testing on

the substitute additive only once, in November 2011, and that Lubrizol provided truthful results.

Instead, the undisclosed fact that ACL alleges caused its harm, to wit, the fact that Lubrizol had severed its commercial relationship with VCS, is a separate nondisclosure, unrelated to Lubrizol's unique knowledge regarding the chemistry of the Lubrizol Additive. Even so, Lubrizol's knowledge about the termination of its commercial relationship with VCS is insufficient without more to create a special duty for purposes of constructive fraud. Indiana law recognizes that "[a]s a matter of course, every buyer/seller relationship likely involves a party who possesses at least some knowledge not possessed by the other, but that fact alone does not mean that one party enjoys a position of superiority over the other so as to create a special duty and right of reliance." *Am. Heritage Banco*, 928 N.E.2d at 247. The allegations as a whole reflect a purely arms' length business relationship between ACL and Lubrizol, both sophisticated commercial entities. Their relationship was centered on the preparation for and completion of the Field Test from late 2009 through the majority of 2010, and both ACL and Lubrizol stood to gain financially from the outcome of the Field Trial. There is no allegation or showing by ACL that in failing to disclose the termination of the business relationship between VCS and Lubrizol that Lubrizol gained an advantage at the expense of ACL. Instead, nothing about the commercial relationship between these two well-established and experienced companies supports the creation of a duty of good faith and fair dealing that could support a viable constructive fraud claim against Lubrizol.

C.     **Count IV: Civil Deception Claim**

ACL alleges in Count IV of its Second Amended Complaint that Lubrizol is liable for civil deception under Indiana Code § 34-24-3-1, which provides a private cause of action to an entity who suffers a pecuniary loss as a result of another entity's violation of selected Indiana crime statutes.  Here, ACL alleges that Lubrizol violated one such statute, to wit, Indiana Code § 35-43-5-3(a)(6), which provides that a "person who … with intent to defraud, misrepresents the identity of the person or another person or the identity or quality of property … commits deception, a Class A misdemeanor." Specifically, ACL alleges that Lubrizol is liable for civil deception under the theory that Lubrizol misrepresented the true identity, nature, and quality of the product being sold to ACL by remaining silent when it should have informed ACL that its relationship with VCS had ended, that it was no longer supplying the Lubrizol Additive to VCS, and that the product VCS was continuing to sell ACL was not the Lubrizol Additive.  ACL also alleges that Lubrizol made affirmative misrepresentations sufficient to support a civil deception claim, including by stating that it would continue to "support and validate the fuel efficiency improvement for the vessels defined by ACL" (*id.* at ¶ 75); communicating with ACL in February 2011 regarding instructions on the use of the Lubrizol Additive in ACL's towing vessels; and leaving its dosing equipment in place on ACL's vessels for eight months after it ended its relationship with VCS, indicating that it remained involved in ACL's use of the Lubrizol Additive.

As explained in Part II.B., *supra*, we find no basis on which to show that a special relationship existed between ACL and Lubrizol sufficient to create a duty on the part of Lubrizol to reveal the conclusion of its commercial relationship with VCS.  Absent such

17

a duty to disclose, no civil deception claim can be established. Nor do ACL's allegations regarding affirmative misstatements by Lubrizol support a civil deception claim. Initially, we note that ACL does not allege that Lubrizol ever made any direct misrepresentation that the Ultra Max it received from VCS contained the Lubrizol Additive. Rather, ACL alleges that Lubrizol made affirmative misrepresentations regarding its "continued involvement" with VCS, thereby misrepresenting that the product ACL received was the Lubrizol Additive. Such a conclusion requires a string of inferences regarding Lubrizol's continued involvement, which even if true, could not be reasonably understood to constitute a misrepresentation about the quality or identity of a product. Even if they could, ACL's allegations are insufficient for the additional reasons detailed below.

ACL cites an email communication dated February 3, 2011 from Lubrizol employee Toni Tonti to VCS employee Mark Michelson which states in part that Lubrizol "believes that the trial fuel efficiency improvement would be obtained across the entire fleet, if additive is used continuously and at the same treat level" and that Lubrizol "will support and validate the fuel efficiency improvement for the vessels defined by ACL" as long as ACL provides the proper vessel data. Exh. 35 attached to Sec. Am. Compl. ACL contends that this statement establishes that Lubrizol misrepresented that its relationship with VCS and ACL was ongoing, thereby misrepresenting to ACL that the product it received was the Lubrizol Additive.

However, under Indiana law, "[a] fraudulent misrepresentation involves a false statement regarding a past or existing material fact." *Clinton Cnty. ex rel. Bd. of Com'rs*

*v. Clements*, 945 N.E.2d 721, 728 (Ind. Ct. App. 2011) (citation omitted).

Representations regarding future conduct cannot support an action for fraud under

Indiana law. *See, e.g.*, *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App.

1998). When read in context, it is clear that this statement contains no representation of a

past or existing fact, but instead is an entirely forward-looking, conditional promise – if

the Lubrizol Additive is used and if ACL properly provides data to Lubrizol, then

Lubrizol will continue to provide data analysis. Statements regarding what a party

"would" do in the future are not representations of past or present facts under Indiana law

sufficient to establish misrepresentation. *See Schott v. Huntington Nat'l Bank*, 914 F.

Supp. 2d 933, 942-43 (S.D. Ind. 2012).[2]

    ACL also points to communications it had with Lubrizol in February 2011during

which Lubrizol furnished ACL instructions concerning the proper way to unload, store,

and dose the Lubrizol Additive in ACL's towing vessels, which ACL now claims

misrepresented Lubrizol's continued involvement with ACL and VCS. However,

according to the allegations in the complaint, Lubrizol did not end its commercial

relationship with VCS until March 2011, making its relationship at that point still

continuing. Accordingly, Lubrizol's instructions to ACL in this regard do not constitute

a misrepresentation of any past or present fact.

---

[2] We also note that Mr. Tonti's email was sent to VCS not ACL. VCS then forwarded the email
to ACL without copying Mr. Tonti. Moreover, the email was sent on February 3, 2011, at which
point VCS and Lubrizol had not yet ended their commercial relationship. Accordingly, the email
could not have misrepresented the relationship between Lubrizol and VCS as ACL alleges.

Finally, ACL argues that the fact that Lubrizol left its dosing equipment in place on ACL's vehicles for months after it had terminated its relationship with VCS falsely misled ACL into assuming that Lubrizol remained involved in ACL's use of the additive and in supplying VCS the Lubrizol Additive. Such an action as this does not constitute an affirmative misrepresentation sufficient to support a civil deception claim. For these reasons, ACL's civil deception claim will be dismissed.

### D. Count IX: Third Party Beneficiary Claim

Count IX of the Second Amended Complaint alleges a third party beneficiary claim. To enforce a contract under Indiana law as a third-party beneficiary, an entity must show: "(1) a clear intent by the actual parties to the contract to benefit the third party; (2) a duty imposed on one of the contracting parties in favor of the third party; and (3) performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract." *Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 971 (Ind. Ct. App. 2013) (citing *Centennial Mortg. Inc. v. Blumenfeld*, 745 N.E.2d 268, 276 (Ind. Ct. App. 2001)). "A third party does not have the right to sue under a contract merely because he may derive an incidental benefit from the performance of the promisor." *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citation omitted).

Lubrizol argues first that the Second Amended Complaint does not clearly identify the contract pursuant to which Lubrizol agreed to sell the Lubrizol Additive to VCS for supply to ACL that is the basis for ACL's third party beneficiary claim. Second, Lubrizol contends that, assuming the contract at issue is the February 2011 Order

Acknowledgement confirming VCS's February 2, 2011 order of the Lubrizol Additive, there is no indication on the face of that contract of a clear intent of the parties to benefit ACL. ACL rejoins that not only does the February 2011 Order Acknowledgement identify ACL as the recipient of the Lubrizol Additive, ACL's allegations regarding the history of the relationship between ACL, Lubrizol, and VCS, specifically their joint participation in the Field Test which culminated in the February 2011 order, are sufficient to support the assertion that ACL was the intended third-party beneficiary of the agreement between Lubrizol and VCS for the supply of the Lubrizol Additive.

We are not persuaded by Lubrizol's argument that the contract giving rise to this claim is insufficiently identified in the Second Amended Complaint. In Count IX, ACL describes the contract as "the contract pursuant to which Lubrizol agreed to sell the Lubrizol Additive to VCS for supply to ACL." Sec. Am. Compl. ¶ 219. Earlier in the complaint, ACL alleges that VCS placed an order for the Lubrizol Additive with Lubrizol on February 2, 2011 in anticipation of filling ACL's initial order and that, on February 23, 2011, Lubrizol issued to VCS an "Order Acknowledgement" confirming VCS's February 2 order and listing ACL in the "ship-to" box on the document. *Id.* ¶¶ 81, 85-86. These allegations are sufficiently specific to put Lubrizol on notice of the contract on which ACL's third party beneficiary claim is based.

However, ACL has failed to adequately allege that the contract between VCS and Lubrizol shows a clear intent to benefit ACL. In order to recover on a third party beneficiary claim, "[t]he contract must evidence an intention to benefit a third person; the intention must clearly appear from the terms of the contract." *In re Estate of Von*

*Wendesse*, 618 N.E.2d 1332, 1337 (Ind. Ct. App. 1993); *see also Luhnow*, 760 N.E.2d at 630 (holding that intent to benefit third party must appear from the terms of the contract). The contract at issue here does not specify ACL as a third party beneficiary nor for that matter does it name any class of third parties that the contract is intended to benefit.

On the order receipt that is attached to Lubrizol's standard terms and conditions of sale, the "ship-to" recipient is listed as "ACL FOR VCS CHEMICAL" with ACL's shipping address printed below.  ACL contends that this fact, coupled with the facts alleged regarding the nature of the relationship among ACL, VCS, and Lubrizol (i.e., that VCS and Lubrizol together marketed the Lubrizol Additive to ACL, which led to the three companies jointly creating and implementing the Field Test, and culminating in a supply arrangement in which Lubrizol would provide the Additive to VCS for supply to ACL), are sufficient to allege a clear intent to benefit.  We disagree.

With regard to the fact that ACL is listed as the "ship-to" recipient on the order receipt, although the parties have not pointed us to and our research has not revealed an Indiana case directly on point, jurisdictions that have addressed this issue have clearly held that this is insufficient to establish a clear intent to benefit.  *See Wheeling Trust & Sav. Bank v. Tremco Inc.*, 505 N.E.2d 1045, 1048 (Ill. App. Ct. 1987) (holding that language in purchase orders "merely refer[ing] to the delivery site for goods requested by a sub-contractor's purchase order issued to a material supplier" without language "stat[ing] that the … materials provided were specifically for plaintiffs" was insufficient to establish intent to benefit); *TD Props., LLC v. VP Bldgs., Inc.*, 602 F. Supp. 2d 351, 357-58 (D. Conn. 2009) ("The general rule, however, as seen in the Restatement, is that a

property owner, in contracting for the construction of a building with a contractor who, in turn, has contracted with another entity to supply building materials, is an incidental beneficiary, not third-party beneficiary, of the contract between the contractor and the supplier.").

Nor are the facts regarding the parties' course of conduct and the nature of their relationship sufficient to allege an intent to benefit. Indiana law is clear that such intent must "appear from the terms of the contract." *Luhnow*, 760 N.E.2d at 630. As noted above, the terms of the contract here do not identify or even reference a third party. The contract also contains no reference to subsequent resale of the product or any other language that would indicate that benefit to a third party was clearly intended and contracted for under the purchase order. For these reasons, we find that ACL has failed to adequately plead a third party beneficiary claim.

### E.     Count XI: Tortious Inference with Contract Claim

ACL next alleges that Lubrizol is liable under Indiana law for tortious interference with a contract. Specifically, ACL claims that contracts existed between VCS and ACL pursuant to which VCS agreed it would deliver the Lubrizol Additive to ACL and ACL agreed to pay for the Additive. ACL alleges that VCS breached the contracts by failing to provide the Lubrizol Additive to ACL and that Lubrizol intentionally induced that breach by refusing to deliver to VCS the Lubrizol Additive for supply to ACL. Sec. Am. Compl. ¶¶ 234-37. The elements of a claim of tortious interference with contract under Indiana law are: (1) the existence of a contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional interference with the contract by

23

causing one party to breach the contract; (4) no justification for the interference; and (5) damage resulting to the plaintiff from the breach of the contract. *Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 797 (S.D. Ind. 2011) (citing *Melton v. Ousley*, 925 N.E.2d 430, 440 (Ind. Ct. App. 2010)).

Lubrizol again argues that ACL has failed to specify in the Second Amended Complaint which contract(s) between ACL and VCS provided for the delivery of the Lubrizol Additive that Lubrizol is alleged to have caused VCS to breach. Lubrizol contends that it therefore has been left to guess as to the factual basis of the claim and for that reason ACL's tortious interference with contract claim should be dismissed. Lubrizol further contends that, while ACL elsewhere alleges that ACL sent purchase orders to VCS for the Lubrizol Additive and VCS sent invoices to ACL in response, Lubrizol is not a party to or copied on any of those purchase orders and most of them are dated after Lubrizol ended its supply relationship with VCS. Accordingly, Lubrizol asserts that ACL has failed to allege sufficient facts from which it can be reasonably inferred that Lubrizol had knowledge of the existence of those contracts, warranting the dismissal of the tortious interference claim against it.

We cannot conclude with the certainty and clarity required in ruling on a Rule 12(b)(6) motion that the purchase orders between ACL and VCS, even those dated after Lubrizol ended its supply relationship with VCS, were not generated when Lubrizol and VCS still maintained their commercial relationship. The Second Amended Complaint alleges that Lubrizol was aware of the February 7, 2011 purchase order (which was placed before Lubrizol ended its relationship with VCS) and that Lubrizol prepared

24

barrels of the Lubrizol Additive for VCS to utilize in filling ACL's initial order. Whether ACL will ultimately be able to prove these allegations and whether Lubrizol's knowledge extended to subsequent purchase orders we do not know at this point. But ACL has at least sufficiently alleged that Lubrizol had some knowledge of an agreement between ACL and VCS to supply the Lubrizol Additive. Lubrizol does not challenge the sufficiency of the pleadings on any other basis. Thus, we find that ACL's tortious interference with contract claim survives the motion to dismiss.

### F. Failure to Adequately Plead Injury

Finally, Lubrizol asserts that ACL's demand for damages for lost fuel efficiency should be dismissed because the Second Amended Complaint fails to adequately plead injury on this basis. ACL alleges that, as a result of Lubrizol's conduct, ACL suffered damage in the form of lost fuel cost savings (based on Lubrizol's calculations that regular use of the Lubrizol Additive in ACL's vessels would have yielded fuel cost savings to ACL in the amount of $2,654,400 per year) and by paying $1,062,862.75 for a product that was not the Lubrizol Additive that had been tested and validated by the Field Test and accepted for use by ACL. Lubrizol rejoins that ACL has failed to allege specific facts to support its conclusory assertion that the counterfeit additive failed to provide the same fuel efficiency ACL would have had with the Lubrizol Additive.

ACL is not required to prove its damages at the pleading stage. The Second Amended Complaint gives adequate notice to Lubrizol that it is seeking to recover damages for alleged lost fuel cost savings and the amount it paid for the counterfeit additive, believing it was the Lubrizol Additive it had ordered. Whether ACL can

ultimately prove these losses is another issue to be determined when the litigation concludes. For now, for purposes of this motion to dismiss, we hold that ACL has adequately pled damages.

## III.   Conclusion

For the reasons detailed in this entry, Lubrizol's Motion to Dismiss is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>. ACL's claims against Lubrizol based on a theory of apparent authority (Counts II, VI, and XII) as well as its constructive fraud (Count III), civil deception (Count IV), and third party beneficiary (Count IX) claims are hereby dismissed. ACL's tortious interference with contract (Count XI) claim remains and will proceed accordingly.

IT IS SO ORDERED.

Date:   _____03/28/2014_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Robert Gregg Hovious
FULTZ MADDOX HOVIOUS & DICKENS PLC
ghovious@fmhd.com

Jennifer M. Stinnett
FULTZ, MADDOX,HOVIOUS & DICKENS, PLC
jstinnett@fmhd.com

Julie A. Harris
LUBRIZOL CORPORATION
julie.harris@lubrizol.com

Jeffrey D. Roberts
ROBERTS MEANS LLC
jroberts@robertsmeans.com

William P. Means
ROBERTS MEANS LLC
wmeans@robertsmeans.com

Elizabeth A. Grove
THE LUBRIZOL CORPORATION
elizabeth.grove@lubrizol.com

Suzanne F. Day
THE LUBRIZOL CORPORATION
suzanne.day@lubrizol.com