UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| AMERICAN COMMERCIAL LINES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:12-cv-135-SEB-WGH |
| | ) | |
| THE LUBRIZOL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**
**[Docket No. 182]**

Plaintiff American Commercial Lines LLC ("ACL") has brought this action against Defendant Lubrizol Corporation ("Lubrizol") alleging, *inter alia*, that Lubrizol's decision to end its commercial relationship with VCS Chemical Corp. ("VCS") by discontinuing supplies of Lubrizol's fuel additive product to VCS induced VCS to breach 25 purchase orders that ACL had placed with VCS for that fuel additive. VCS instead filled those orders with additive from Afton Chemical Company without notifying ACL of the change, which ACL alleges resulted in damages. The only claim currently unresolved in this case is ACL's allegation of tortious interference with contract. Lubrizol has moved for summary judgment on this issue.

**I. Summary Judgment Standard**

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts

must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). At the summary judgment stage, the court may not resolve issues of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997).

## II. Undisputed Facts

The following facts are taken as true and construed in the light reasonably most favorable to ACL, the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

On January 28, 2011, Cathy Engel, Lubrizol's Ethics Manager, received an anonymous call on Lubrizol's Ethics Help Line about one of its customers, VCS. (Ex. B, deposition of Engel at 15). Engel contemporaneously documented the details of the call in handwritten notes. (Ex. A, Tab 1). The caller stated that Lubrizol sales employee Brian Oller had started a separate chemical company outside of Lubrizol named VCS and had "set up" VCS as a Lubrizol customer. The caller directed Engel to the New Hampshire Secretary of State website, where Oller is registered as the agent for VCS. *Id.*

Upon receiving the Ethics Help Line call, Engel notified Lubrizol's Corporate Ethics Manager, Kristin Marquardt. (Ex. C, deposition of Marquardt, at 16). An ethics investigation

into the relationship between Oller and VCS was undertaken pursuant to which Engel and Marquardt collected documentation and other information relating to Oller and VCS. (Ex. B at 14-15; Ex. C at 20-21). After a week of investigation, VCS Chemical Corp. was discovered to be a customer of Lubrizol, and its account was serviced by Lubrizol sales employee, Brian Oller. (Ex. A, Tab 4). It was also discovered that Lubrizol and VCS had entered into a Secrecy Agreement with one another to pursue numerous commercial opportunities brought to Lubrizol by VCS. (Ex. A, Tab 21).

Oller's boss, Keith Nuzzo, then a Lubrizol Sales Manager, was notified of these findings and shown the documents obtained by Engel. (Ex. A, Tab 5). Nuzzo met with Oller on February 8, 2011 to inquire about his relationship with VCS. (*Id.* at 20-21; Ex. A, Tab 6). Based on that meeting, Nuzzo concluded that Oller's involvement with VCS constituted a conflict of interest in violation of Lubrizol's Legal and Ethical Guidelines, and Oller's employment was therefore terminated. (*Id.*) Lubrizol and VCS continued working together on several commercial opportunities, prompting Lubrizol to continue its ethics investigation even after Oller's termination, since that matter was still unresolved. (*Id.*)

On February 2, 2011, an order was processed by VCS for 200 drums of Lubrizol additive to be shipped to ACL. (Ex. A, Tab 19). At the time of that order, Lubrizol still needed to determine what to do with regard to VCS and in particular what to do with this processed order. (Ex. C at 94). In light of the ongoing investigation of VCS, on February 9, 2011 Marquardt, in consultation with Lubrizol's Vice President of Sales, Mark Pringle, placed a "block" on the February 2 order. (Ex. C at 94-95; Ex. A, Tab 7). The block meant "that no further orders were accepted" from VCS. (Ex. C at 94).

As the investigation of VCS continued over the ensuing weeks, Lubrizol uncovered additional connections between Oller and VCS and VCS's owner, Mark Michelsen. Marquardt

documented key findings in a memo to the file including that New Hampshire corporate documents named Oller as a registered agent, contact person, and sole incorporator of Vega Innovations, VCS's predecessor and another former Lubrizol customer. (Ex. A, Tab 3-4). Oller also was a contact person for VCS in New Hampshire and jointly owned a car with VCS. (*Id.*). A report from a private investigation firm along with additional information revealed other questionable connections between Oller and VCS. Lubrizol's investigation led the company to the conclusion that VCS with Oller's help had profited from a transaction to Lubrizol's detriment. (*Id.*).

Marquardt and Nuzzo met with Michelsen on February 22, 2011 as part of Lubrizol's investigation into VCS. (Ex. C at 134; Ex. D at 55). Lubrizol had several commercial opportunities in process with VCS in addition to the ACL field trial. The focus of the February 22, 2011 meeting was the nature and extent of Oller's involvement with VCS. (*Id.*).

Following the meeting with Michelsen, Marquardt documented various factual discrepancies she perceived in his responses, (Ex. A, Tab 15; Ex. C at 139-40), and reported her findings to Mark Pringle, Vice President of Sales for Lubrizol Additives. Pringle was the person at Lubrizol who decided to end Lubrizol's commercial relationship with VCS. (Ex. E, deposition of Pringle, at 35).

Marquardt's ethics investigation report was dated March 3, 2011, (Ex. A, Tab 16), the purpose of which was expressed thusly: "[T]he following analysis was undertaken to determine whether business should be continued with VCS in light of the situation involving Brian Oller." (*Id.*).

In a phone conversation on March 4, 2011, Marquardt and Nuzzo, acting on behalf of Lubrizol, informed Michelsen, the owner of VCS, that Lubrizol would no longer supply VCS. (Ex. A, Tab 17). Lubrizol's reasons for ending that relationship were scripted by Marquardt in

advance of the call: "If he asks for reasons: We believe you have misrepresented your company to us. We have also learned more about the resale to Excelda which Oller orchestrated on your behalf. We would never have accepted your orders had we been aware of what was going on." (*Id.*).

Michelsen followed up with Marquardt on March 8, 2011, during which call Marquardt repeated Lubrizol's reasons for ending its relationship with VCS and refusing future shipments; in documenting that conversation, Marquardt recorded: "[H]e wanted to talk about our reasons for ending the relationship, and to find out what could be done to restore it. Very briefly, I told him we had serious concerns about Oller's involvement in VCS and also about transactions between Lubrizol and VCS." Lubrizol's Vice-President for Sales, Mr. Pringle, responded to the Marquardt account: "Not sure what he thinks that can be done to restore our confidence in VCS." (Ex. A, Tab 18). VCS's lawyers contacted Marquardt two days later and, according to Marquardt, their discussion related to Lubrizol's reasons for ending its dealings with VCS: "[W]e walked through what we had learned in the course of the investigation and the reasons for the decisions that we had made…." (Ex. C at 221).

Throughout 2011, Plaintiff ACL sent 25 purchase orders to VCS for "Additive, Marine Fuel, 54 Gal. Drum, Lubrizol." (See Ex. A, Tab 20). The first ACL purchase order was transmitted to VCS on February 9, 2011, and the next order from ACL to VCS was sent on April 7, 2011. (*Id.*). Lubrizol represents it never saw any of these ACL purchase orders prior to their production in this case. Following Lubrizol's termination of its relationship with VCS, VCS obtained an additive from Afton Chemical Company which it shipped to ACL to fill ACL's 2011 purchase orders. (Ex. F, deposition of Michelsen, at 189). This additive was not the same product as was being sold by Lubrizol.

5

ACL used this Afton additive on 64 tow boats. (Ex. G, deposition of Masters, at 204). Only thirteen of these 64 tow boats had Vehicle Monitoring Sensors ("VMS"), which measured and recorded the fuel supply and return rates on the boat engines, and only nine of the thirteen generated valid data. (*Id*. at 89). The other boats in which the Afton additive was used during 2011 had no VMS. (*Id.* at 90). It is undisputed that ACL was not aware that it had been sold an additive other than a Lubrizol additive prior to November 8, 2011, when representatives of Lubrizol informed ACL that Lubrizol had ended its relationship with VCS.

ACL filed this lawsuit in November 2012, alleging numerous claims against VCS relating to the sale of the substituted product, all of which have now been settled. ACL brought eleven claims against Lubrizol, only one of which is now pending. (*See* Footnote 1, *supra*). That claim, set forth in Count XI of the Second Amended Complaint, is a claim against Lubrizol for tortious interference with contract.

ACL alleges that VCS breached ACL's purchase orders by failing to deliver Lubrizol additive to ACL. (Second Amended Complaint, ¶ 236). ACL further alleges that "Lubrizol Corporation intentionally induced VCS's breach of the contracts by failing and refusing to deliver to VCS the Lubrizol Additive for supply to ACL." (Second Am. Compl., ¶ 237). ACL claims that it was injured by the substitution of the Afton additive because the Afton additive had "zero value" to ACL in that it provided less benefit to ACL than the Lubrizol additive. (*Id.* at ¶ 239).

### III. Discussion

Under Indiana law, a plaintiff claiming tortious interference with contract must prove the following elements: "(i) existence of a valid and enforceable contract; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional inducement of a breach of the

contract; (iv) the absence of justification; and (v) damages resulting from defendant's wrongful inducement of the breach." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994). Lubrizol maintains that there is no material question of fact as to any of these elements and that the claim cannot survive and should be dismissed. ACL in response claims that factual disputes remain "as to Lubrizol's actual motives for canceling VCS's orders," and that the facts in support of all other elements redound to their benefit. (Pl.'s Resp. at 1).

Both parties agree that contracts existed between ACL and VCS, which, according to ACL, were interfered with. This is where the parties' agreement ends. Though Lubrizol contests having knowledge these contract existed, we construe the facts in a light most favorable to ACL, the nonmoving party, which imputes to Lubrizol at least constructive knowledge of these contracts. Lubrizol clearly did know of the relationship between ACL and VCS and that VCS had placed orders with Lubrizol for the fuel additive that was to be shipped to ACL. Even if Lubrizol did not know any other details, it likely did know that VCS had purchased the additive based on some form of an agreement with ACL.

The parties' dispute focuses on the final two elements of this claim, to wit, the absence of justification and damages. Each side has its own take on whether Plaintiff can successfully prove damages. However, apart from any damages issues, it is ACL's inability to present a reasonable dispute of material fact as to the fourth element of its claim, to wit, Defendant's absence of justification for the interference, that dooms ACL's claim for tortious interference.

Under Indiana law, "absence of justification" requires proof that the "interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Miller v. Central Ind. Commty. Found., Inc.*, 11 N.E.3d 944, 961 (Ind. Ct. App. 2014) (quotation marks and citation omitted). Here, the evidence

clearly establishes that Lubrizol *did* have a legitimate business purpose for ending its commercial relationship with VCS, namely, its determination that VCS had engaged in deceptive and unethical conduct that was detrimental to Lubrizol and rendered VCS an unsuitable business partner.

ACL's argument to the contrary rests primarily on a few lines from deposition testimony clearly taken out of context. ACL maintains that Lubrizol's decision to terminate its relationship with VCS was reached before Lubrizol had conducted a full investigation or established any wrongdoing on the part of VCS and was therefore based on nothing more than a "mere 'gut feeling.'" (Pl.'s Resp. at 11).  ACL characterizes Lubrizol's decision as hasty, arguing that it was unsupported by evidence.  Further, ACL accuses Lubrizol of a failure to investigate the potential for harm to ACL before it ended its commercial relationship with VCS, which evinces the "disinterested  malevolence" of tortious interference (*Id.* (citing *Bilimoria Computer Sys., LLC v. America Online, Inc.*, 829 N.E.2d 150, 157 (Ind. Ct. App. 2005)). When read in proper context, however, the excerpts on which ACL relies convey a different story.

ACL relies on a quote from the deposition of Mr. Pringle, who made the final decision to terminate Lubrizol's relations with ACL. The mention of a "gut feeling" arises three times in his deposition, but a full reading of his testimony makes clear that his feelings of unease over the apparent conflict of interest by Brian Oller, which eventually led him to make the decision to terminate Lubrizol's relationship with VCS, were based on information about VCS and Oller that had at that point already been discovered through the company's investigation. Thus, when read as a whole, Mr. Pringle's testimony establishes that his decision was not arbitrary, as ACL tries to make it seem; rather, it was motivated by his belief that the facts uncovered during the ethics investigation were troublesome enough that continuing to do business with VCS was unwise. (Def.'s Reply, Ex. 15, at 28-29, 32-33, 35-36).

ACL also invokes the phrase "disinterested malevolence," to describe the applicable standard under Indiana law for the absence of justification element of tortious interference, arguing that Lubrizol's admitted failure to consider the negative effect on ACL before terminating its business relationship with VCS fully defines that term. ACL cites the Indiana Court of Appeals decision in *Bilimoria Computer Systems, LLC v. American Online, Inc.*, 829 N.E.2d 150 (Ind. Ct. App. 2005) for this standard. The complete excerpt from *Bilimoria* states as follows:

> [The element of absence of justification] is established only if the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another. *Morgan Asset Holding Corp. v. CoBank, ACB,* 736 N.E.2d 1268, 1272 (Ind.Ct.App.2000); *see also Flintridge Station Assoc. v. Am. Fletcher Mortgage Co.,* 761 F.2d 434, 441 (7th Cir.1985) (defining, in part, "unjustified" as "disinterested malevolence.") The existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability. *Morgan*, 736 N.E.2d at 1272.

*Bilimoria*, 829 N.E.2d at 156-57. Thus, "disinterested malevolence" is not a more lenient standard for absence of justification. Case law makes clear that ACL must establish that Lubrizol acted with malicious intent "unmixed with any other [intent] and exclusively directed to injury and damage of another." *Flintridge Station Assocs. v. American Fletcher Mortgage Co.*, 761 F.2d 434, 441 (7th Cir. 1985) (quotation marks and citation omitted). To be actionable, the interference must be "tortious," that is to say, not inadvertent, not happenstance, not secondary to the other purposes. The evidence before us falls far short of this standard. Indeed, the facts in the record establish that Lubrizol made its decision to terminate its business relationship with VCS based primarily, if not entirely on its legitimate interest in avoiding unethical business practices with untrustworthy business partners.

In sum, we find that Lubrizol's "conduct [was] fair and reasonable under the circumstances." *Winkler*, 638 N.E.2d at 1235 (stating that whether there was a fair and reasonable conduct is the "overriding question" in tortious interference cases). The undisputed

9

evidence establishes that Lubrizol's decision was based on well-founded ethical concerns and sound business judgment. No reasonable jury could find that Lubrizol's exclusive justification for its actions was either malicious or unconnected to any legitimate business purpose or that it was based solely on the goal of inducing VCS to breach its contract with ACL. Accordingly, Lubrizol is entitled to summary judgment on ACL's claim for tortious interference with contract.[1]

### IV. Conclusion

For the foregoing reasons, the Court <u>GRANTS</u> Defendant's Motion for Summary Judgment. Final judgment shall issue accordingly.

**IT IS SO ORDERED**.

Date: _____9/10/2015_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**Served electronically on all ECF-registered counsel of record.**

---

[1] Given that ACL has failed to establish an absence of justification for the interference, we need not address whether it has shown that it suffered actual damages as a result of Lubrizol's conduct.